

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

GLENDA KIRKENDOLL, )
                 Appellant, )
                 )
v. ) WD85388
                 )
AUTO-OWNERS INSURANCE ) FILED: November 15, 2022
COMPANY, )
              Respondent. )

**Appeal from the Circuit Court of Randolph County**
**The Honorable Scott A. Hayes, Judge**

**Before Division One: W. Douglas Thomson, P.J.,**
**Alok Ahuja, J., and Terry A. Tschannen, Sp.J.**

Glenda Sue Kirkendoll was injured in an automobile accident. She sued Auto-Owners Insurance Company in the Circuit Court of Randolph County, to recover for her injuries from underinsured motorist coverage which Auto-Owners had issued. The circuit court granted Auto-Owners' motion for summary judgment, and Kirkendoll appeals. Because the driver who caused Kirkendoll's injuries was not driving an "underinsured automobile" within the meaning of Auto-Owners' policy, we affirm.

## Factual Background

On December 21, 2018, a vehicle driven by Mason Rogers rear-ended a vehicle driven by Robert Wayne Jones in Moberly. Kirkendoll was a passenger in Jones' car, and was injured.

Rogers' vehicle was insured by Farm Bureau Town & Country Insurance Company of Missouri, under a policy which provided $50,000 per person in bodily-

injury liability coverage. Farm Bureau offered Kirkendoll $50,000 in settlement of her claim against Rogers. Kirkendoll accepted.

At the time of the accident, Jones' vehicle was insured under a policy issued by Auto-Owners. Jones' policy provided underinsured motorist coverage with a stated limit of liability of $50,000 per person. After accepting Farm Bureau's $50,000 settlement offer, Kirkendoll made a claim for underinsured motorist coverage under Jones' policy. Auto-Owners denied Kirkendoll's claim.

Kirkendoll filed this action in the Circuit Court of Randolph County against Jones and Auto-Owners. Kirkendoll's petition alleged that Jones' negligence had caused the accident and her resulting injuries. Kirkendoll also claimed that she was entitled to underinsured motorist coverage under the Auto-Owners policy issued to Jones. In addition, Kirkendoll alleged that she was entitled to damages, penalties, and attorney's fees under § 375.420, RSMo based on Auto-Owners' vexatious refusal to pay her claim.

Auto-Owners filed a Motion for Summary Judgment. It argued that Rogers was not driving an "underinsured automobile" within the meaning of its policy, because Rogers' Farm Bureau policy provided $50,000 in bodily injury liability coverage, the same limit of liability as the underinsured motorist coverage in Jones' Auto-Owners policy. Auto-Owners accordingly contended that Kirkendoll had no right to underinsured motorist coverage under its policy. The circuit court granted summary judgment to Auto-Owners on August 20, 2021, agreeing that Rogers' vehicle was not an "underinsured automobile" within the meaning of the Auto-Owners policy.

On May 4, 2022, Kirkendoll voluntarily dismissed her claims against Jones without prejudice, and filed her notice of appeal.

2

**Standard of Review**

"Whether to grant summary judgment is an issue of law that this Court determines *de novo*. The interpretation of an insurance policy is a question of law that this Court also determines *de novo*." *Owners Ins. Co. v. Craig*, 514 S.W.3d 614, 616 (Mo. 2017) (citations and internal quotation marks omitted).

**Discussion**

Kirkendoll asserts two Points on appeal. In the first, she argues that Auto-Owners' policy does not provide underinsured motorist coverage in an amount at least twice the minimum liability coverage specified in § 303.020(10), RSMo. Kirkendoll contends that, as a result, Auto-Owners' underinsured motorist coverage must "be construed to provide coverage in excess of the liability coverage" under Rogers' policy by operation of § 379.204, RSMo. In her second Point, Kirkendoll argues that the circuit court erroneously concluded that Rogers' vehicle was not an "underinsured automobile."

We reject Kirkendoll's second Point, and conclude that the circuit court correctly held that Rogers' vehicle was not an "underinsured automobile" within the meaning of the Auto-Owners policy. Because Auto-Owners' underinsured motorist coverage was never triggered, it is unnecessary for this Court to decide Kirkendoll's first Point, which addresses only whether Auto-Owners' financial liability would be reduced by the payment Kirkendoll received from Farm Bureau on Rogers' behalf.

Insurance policies must be read in their entirety; the "risk insured against is made up of both the general insuring agreement as well as the exclusions and definitions." *Craig*, 514 S.W.3d at 617. "Absent an ambiguity, an insurance policy must be enforced according to its terms. If, however, policy language is ambiguous, it must be construed against the insurer." *Seeck v. Geico General Ins. Co.*, 212 S.W.3d 129, 132 (Mo. 2007) (citations and internal quotation marks omitted). "It is well-settled that where one section of an insurance policy promises coverage and

3

another takes it away, the contract is ambiguous." *Craig*, 514 S.W.3d at 617. A party cannot manufacture ambiguity in an insurance policy, however, "by reading only a part of the policy and claiming that, read in isolation, that portion of the policy suggests a level of coverage greater than the policy actually provides when read as a whole." *Id.* "Definitions, exclusions, conditions and endorsements are necessary provisions in insurance policies. If they are clear and unambiguous within the context of the policy as a whole, they are enforceable." *Todd v. Mo. United School Ins. Council*, 223 S.W.3d 156, 163 (Mo. 2007).

In its policy, Auto-Owners agreed to pay compensatory damages for injuries suffered by an individual occupying an insured vehicle, if the owner of an "underinsured automobile" was liable for the injuries. The policy provided:

> Subject to the limitations and reductions on coverage set forth in **SECTION 4. LIMIT OF LIABILITY**, **we** will pay compensatory damages, including but not limited to loss of consortium, that any person is legally entitled to recover from the owner or operator of an **underinsured automobile** for **bodily injury** sustained by an injured person while **occupying** an **automobile** that is covered by . . . the policy.

The policy defines an "underinsured automobile" as

> an **automobile** to which a **bodily injury** liability bond or liability insurance policy applies at the time of the **occurrence**:
>
> > (1) with limits of liability at least equal to or greater than the limits required by the Motor Vehicle Financial Responsibility Law of Missouri; and
> >
> > (2) such limits of liability are less than those stated in the Declarations for Underinsured Motorist Coverage.

The Declarations in the Auto-Owners policy specify that the policy provides underinsured motorist coverage with limits of liability for bodily injury of $50,000 per person and $100,000 per accident. Kirkendoll admits that Rogers' Farm Bureau policy had a bodily-injury limit of $50,000 per person, and that Farm Bureau paid her $50,000 in settlement of her claim against Rogers.

4

If this Court looks solely at the definition of an "underinsured automobile" in Auto-Owners' policy, it is clear that Auto-Owners' underinsured motorist coverage was not triggered, because the limit of liability in Rogers' insurance policy is the same as the $50,000 per-person limit applicable to Auto-Owners' underinsured motorist coverage.

Kirkendoll's briefing does not directly dispute that Rogers' vehicle is excluded from the definition of an "underinsured automobile" in the Auto-Owners policy. Rather, Kirkendoll urges this Court to find that the Auto-Owners' policy, when examined as a whole, is ambiguous and must be construed in favor of coverage.

Kirkendoll points to several alleged ambiguities in the Auto-Owners policy. Most of these purported ambiguities hinge on the assumption that the Declarations page of Auto-Owners' policy "unequivocally states that there is $50,000 in [underinsured motorist] coverage." Kirkendoll contends that the Declarations page's "unequivocal promise" of coverage fails to notify the insured that the amount of coverage Auto-Owners will actually provide is less than $50,000, because Auto-Owners only provides "gap coverage" supplying the difference between the negligent driver's insurance coverage and the stated $50,000 limit.

Kirkendoll's narrow focus on the Declarations page of the Auto-Owners policy, in isolation, is inconsistent with decisions of the Missouri Supreme Court interpreting similar automobile insurance policies. The Supreme Court has emphasized that the declarations page of an insurance policy does not itself grant coverage. Rather, "the declarations 'are introductory only and subject to refinement and definition in the body of the policy.'" *Craig*, 514 S.W.3d at 617 (quoting *Peters v. Farmers Ins. Co.*, 726 S.W.2d 749, 751 (Mo. 1987)). "The declarations 'do not grant coverage. The declarations state the policy's essential terms in an abbreviated form, and when the policy is read as a whole, it is clear that a reader must look elsewhere to determine the scope of coverage.'" *Id.* (quoting *Floyd-*

5

*Tunnell v. Shelter Mut. Ins. Co.*, 439 S.W.3d 215, 221 (Mo. 2014)); *see also, e.g.,*

*Jones v. American Family Mutual Ins. Co., S.I.*, 632 S.W.3d 482, 488 (Mo. App. W.D.

2021) ("[O]ur Missouri Supreme Court has made clear that the Declarations page of

insurance policies do[es] *not* grant any *coverage.*").

A general "Insuring Agreement" is the first provision appearing on the first

page of the Auto-Owners policy. It expressly advises the reader that the policy's

Declarations must be read in the context of the remainder of the policy:

> The attached Declarations describe the **automobile(s) we**
> insure and the Coverages and Limits of Liability for which **you** have
> paid a premium. **We** agree to insure the described **automobile(s)** for
> those Coverages and Limits of Liability *subject to the terms and
> conditions of this policy*. In return **you** must pay the premium and
> comply with all the terms and conditions of this policy.

(Italics added.)

The other policy provisions governing underinsured motorist coverage clearly

and unambiguously state that the policy provides only "gap" coverage to supplement

the insurance coverage held by the underinsured, negligent driver. Those

provisions also plainly state that the limits of liability listed on the Declarations

page for underinsured motorist coverage represent the total amount of coverage

which will be made available to an injured person, by combining the underinsured

motorist's insurance coverage with Auto-Owners' coverage. Reading the relevant

policy provisions as a whole, a reasonable insured could not come to the conclusion

that the policy promised that Auto-Owners would itself pay up to $50,000 for

injuries caused by an underinsured driver.

Thus, the policy's "Coverage" section explains the operation of the

underinsured motorist coverage in the following terms:

> **Our** Underinsured Motorist Coverage *provides gap coverage* for
> **you** and any insured person who is legally entitled to recover damages
> for bodily injury from the owner or operator of an **underinsured
> automobile**. *This Underinsured Motorist Coverage is designed only to*

6

*place **you** and any insured person in the same position that **you** and any insured person would have been if the owner or operator of the **underinsured automobile** had a **bodily injury** liability bond or policy with limits of liability for **bodily injury** equal to the limits of liability for this coverage* at the time of the **occurrence** and is not intended to provide excess coverage over the coverage provided by the **bodily injury** liability bond or policy applicable to the owner or operator of the **underinsured automobile**. Our payment of Underinsured Motorist Coverage is further subject to the limitations and reductions on this coverage set forth in **SECTION 4. LIMIT OF LIABILITY**.

(Italics added.)

The fact that the limit of liability stated on the Declarations page does not promise underinsured motorist coverage in that full amount is also made crystal clear by the policy's "Limit of Liability" provision, which states:

4. Limit of Liability

a.      *The Limits of Liability stated in the Declarations for Underinsured Motorist Coverage are for reference purposes only*. **Our** duty to pay Underinsured Motorist Coverage is the difference between the Limits of Liability for this coverage and the limitation and reductions on this coverage set forth in **4. Limit of Liability, b.** through **e.** shown below. *Under no circumstances do **we** have a duty to pay **you** or any person entitled to Underinsured Motorist Coverage under this policy the entire Limits of Liability stated in the Declarations for this coverage.*

b.      Subject to the Limits of Liability stated in the Declarations for Underinsured Motorist Coverage and paragraph **4.a.** above, **our** payment for Underinsured Motorist Coverage shall not exceed the lowest of:

(1)      the amount by which the Underinsured Motorist Coverage Limits of Liability stated in the Declarations exceed the total limits of all **bodily injury** liability bonds and liability insurance policies available to the owner or operator of the **underinsured automobile**; or

(2)      the amount by which compensatory damages, including but not limited to loss of consortium, because of **bodily injury** exceed the total limits of all **bodily injury** liability bonds and liability insurance policies available to the owner or operator of the **underinsured automobile**.

7

(Italics added.)

Thus, the Auto-Owners policy clearly states that its underinsured motorist coverage is only "gap" coverage, and is intended only to place an injured person in the same position as if the negligent driver carried insurance with limits of liability equal to those stated on the Declarations page of Auto-Owners' policy. Auto-Owners expressly advises readers that the limits of liability stated for underinsured motorist coverage on the Declarations page "are for reference purposes only," and that "[u]nder no circumstances [does Auto-Owners] have a duty to pay . . . the entire Limits of Liability." The policy could hardly have been clearer that it provided no coverage in circumstances like Kirkendoll's.

The Missouri Supreme Court rejected an argument similar to Kirkendoll's, involving virtually identical policy language, in *Owners Ins. Co. v. Craig*, 514 S.W.3d 614 (Mo. 2017). (Owners Insurance Company and Auto-Owners Insurance Company are corporate affiliates, and evidently use similar policy forms.) In *Craig*, an injured party argued that an automobile liability policy issued by Owners was ambiguous regarding the available amount of underinsured motorist coverage, because the declarations page listed the limit of liability for underinsured motorist coverage as $250,000 per person. Like Auto-Owners' policy, the Owners policy at issue in *Craig* stated that the limit of liability on the declarations page was "for reference purposes only," and "[u]nder no circumstances" did the insurer have a duty to pay the entire listed amount. *Id.* at 617. *Craig* held that these provisions were unambiguous and enforceable.

> In the UIM context, this Court has previously held that an ambiguity exists when the policy contains both: (1) express language indicating the insurer will indeed pay up to the declarations' listed limit amount; and (2) set-off provisions ensuring the insurer will never be obligated to pay such amount. The ambiguity arises from the fact that both statements cannot be true; either the insurer will sometimes pay up to the declarations' listed limit, or the amount it will pay always will be limited by the amount paid by the underinsured

8

motorist. Here, there is no such internal inconsistency or contradiction as . . . the policy contains no express language indicating the insurer will pay up to the declarations' listed limit amount. In fact, the "Limit of Liability" section in the UIM endorsement contains the opposite, stating the declarations' listed limit amount is "for reference purposes only" and "[u]nder no circumstances" will Owners have a duty to pay that entire amount. Essentially, this policy takes a form that this Court previously suggested would be enforceable:

> A policy that plainly states it only will pay the difference between the amount recovered from the underinsured motorist and the [declarations' listed limit amount] is enforceable. In such a case, the mere fact that [the declarations' listed limit amount] will never be paid out is not misleading, for the policy never suggests that this is its liability limit and never implies that it may pay out that amount.
>
> . . . Evaluating the policy as a whole, it unambiguously provides that the declarations' listed limit amount serves only as a reference point for use with the set-off provisions, which are likewise unambiguous.

*Craig*, 514 S.W.3d at 617-18 (quoting *Ritchie v. Allied Prop. & Cas. Ins. Co.*, 307 S.W.3d 132, 141 n.10 (Mo. 2009); citations and footnotes omitted).

Kirkendoll argues that the "Limit of Liability" section creates an ambiguity because subsection (b)(2), when read together with the liability limits on the Declarations page, indicates that Auto-Owners will provide coverage, up to its full limit of liability, for the insured person's injuries which are not covered by the negligent driver's insurance. Subsection (b)(2) of the "Limit of Liability" section provides only one of two alternative measures of the available underinsured motorist coverage, however. The policy plainly states that the insured person will only be entitled to "the lower of" the two measures. And the *other* measure – stated in subsection (b)(1) – is the amount by which Auto-Owners' limit of liability exceeds that in the negligent driver's policy. Here, Rogers had *the same* liability coverage as provided by Auto-Owners' underinsured motorist coverage, meaning that the amount described in subsection (b)(1) is *zero*. There is no ambiguity in the operation of the "Limit of Liability" section in the circumstances of this case.

9

Kirkendoll relies on *Nationwide Insurance Co. v. Thomas*, 487 S.W.3d 9 (Mo. App. E.D. 2016), *Simmons v. Farmers Insurance Co.*, 479 S.W.3d 671 (Mo. App. E.D. 2015), and *Miller v. Ho Kun Yun*, 400 S.W.3d 779 (Mo. App. W.D. 2013), to argue that she is entitled to coverage under Auto-Owners' policy. Each of those cases is distinguishable, however, because the policy language in each case was materially different from the language of Auto-Owners' policy. Thus, in *Thomas*, the policy stated that "[t]he limit of liability shown in the Declarations . . . is our maximum limit of liability for all damages." 487 S.W.3d at 11. This suggested that the insurer would, in <u>some</u> circumstances, pay the full limit shown on the Declarations page, notwithstanding any set-offs for payments received from the negligent driver. Further, the set-off provision in *Thomas* stated (ambiguously) that the "amount otherwise payable for damages under this coverage" would be reduced by payments received from the negligent driver. *Id.* at 12. The policy failed to clearly state that *the limits of liability stated in the declarations* would be reduced by the tortfeasor's payments.

The policy at issue in *Simmons* also contained language fundamentally different from Auto-Owners' policy. Thus, in *Simmons*, the policy's "limits of liability" provision stated that the insurer's "liability . . . cannot exceed the limits" stated in the declarations, 479 S.W.3d at 672, suggesting that the insurer's liability could *reach* (though not exceed) the stated limits. Further, the set-off provision in the policy at issue in *Simmons* stated that the insurer provided underinsured motorist coverage for "the difference between" *the injured person's damages* and the amounts recoverable from the liable party, *id.*, rather than the difference between *the limits of liability of the underinsured motorist coverage* and any third-party recoveries.

In *Miller*, as in *Thomas* and *Simmons*, the "limits of liability" provision of the relevant policy specified that the stated limits constituted "the maximum" coverage,

10

and that the insurer would "pay no more than these maximums." 400 S.W.3d at 782. Further, *Miller* emphasized that the insuring agreement of the policy at issue stated that the insurer "will pay compensatory damages for bodily injury" caused by an underinsured motorist, with "*no qualifiers* such as 'subject to the following provisions,' or 'except as limited herein.'" *Id.* at 792.

In contrast to the policies at issue in *Thomas*, *Simmons*, and *Miller*, the insuring clause in Auto-Owners' policy plainly states that its underinsured motorist coverage is "[s]ubject to the limitations and reductions on coverage set forth in" the policy's "Limit of Liability" section. Further, the policy clearly states that it provides only "gap coverage," that the stated limits of liability "are for reference purposes only," and that "[u]nder no circumstances" will Auto-Owners actually pay those full limits. Finally, the policy's set-off provision clearly states that Auto-Owners' payment under the underinsured motorist coverage will be determined based on the difference between *the stated limit of liability* and the amount paid by or on behalf of the underinsured motorist. Unlike in *Thomas* and *Simmons*, a reader could not read the policy as covering all of an injured person's uncompensated damages, up to Auto-Owners' liability limits.

We recognize that, in *Simmons*, the Eastern District stated that the insured was promised $50,000 in underinsured motorist coverage when "[r]eading the declarations page in isolation," but that this promise was then qualified by other provisions of the policy. 479 S.W.3d at 676. *Simmons* stated that the declarations page and the policy's other provisions were "in conflict," because in its declarations page "[t]he policy . . . provides coverage, then quickly negates [it] in a section the average insured is much less likely to examine." *Id.* According to *Simmons*, because of this purported "conflict," the court was required to apply "an additional level of scrutiny when reading the rest of the Policy," under which the court was required to "strictly and carefully consider any language" in the policy which limited

11

the coverage purportedly granted by the declarations page. *Id.* at 676, 677. The Eastern District followed this analysis in *Thomas*, referring to the "higher level of scrutiny" applicable when the coverage purportedly promised on a declarations page is then limited in the remainder of a policy. 487 S.W.3d at 12-13.

This analysis from *Thomas* and *Simmons* cannot survive the Missouri Supreme Court's more recent decision in *Craig*, which unambiguously states that "[t]he declarations do not grant coverage," and "'are . . . subject to refinement and definition in the body of the policy.'" 514 S.W.3d at 617 (citations omitted). There is no "conflict" between a numerical limit of liability on an insurance policy's declarations page and the policy's definitions, conditions or exclusions, which may operate to limit or completely eliminate coverage in a particular case. No "additional" or "higher level of scrutiny" is applicable in this case, simply because Auto-Owners' policy does not require payment of the full limit of liability stated on the policy's Declarations page.

Kirkendoll suggested at argument that § 379.204, RSMo is relevant to our interpretation of the coverage provisions of Auto-Owners' policy. Section 379.204, RSMo provides:

> Any underinsured motor vehicle coverage with limits of liability less than two times the limits for bodily injury or death pursuant to section 303.020 [of the Motor Vehicle Financial Responsibility Law] shall be construed to provide coverage in excess of the liability coverage of any underinsured motor vehicle involved in the accident.

Section 379.204, RSMo does not mandate that Auto-Owners provide Kirkendoll with underinsured motorist coverage, when the policy itself does not provide coverage in these circumstances. As the Missouri Supreme Court has explained, "unlike many other states, Missouri statutes do not . . . mandate underinsured motorist coverage. Consequently, 'the existence of the [underinsured motorist] coverage . . . [is] determined by the contract entered between the insured

12

and the insurer.'" *Ritchie v. Allied Prop. & Cas. Ins. Co.*, 307 S.W.3d 132, 135 (Mo. 2009) (citations omitted); *see also, e.g., Am. Family Mut. Ins. Co. v. Turner*, 824 S.W.2d 19, 21 (Mo. App. E.D. 1991) ("Missouri does not mandate underinsured motorist coverage. It is purely optional and governed by the rules of contract."). Consistent with *Ritchie*, § 379.204, RSMo does not dictate *the terms* of Auto-Owners' underinsured motorist coverage. The statute does not define an underinsured vehicle, or specify when Auto-Owners' underinsured motorist coverage will be triggered. *Those* issues are governed by the terms of the insurance policy, and in *this case*, those contractual terms defeat Kirkendoll's claim for coverage. Section 379.204, RSMo specifies only how amounts which are *otherwise payable* under a policy's underinsured motorist coverage relate to payments received from the negligent driver; it does not specify <u>when</u> such underinsured motorist payments are legally due.

### Conclusion

Because Kirkendoll is not eligible for underinsured motorist coverage under Auto-Owners' insurance policy, the circuit court's judgment granting Auto-Owners' motion for summary judgment is affirmed.

_____
Alok Ahuja, Judge

All concur.

13